## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 20-cr-00822 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| DONOVAN ALEXANDER and | ) | |
| JARVIS ALEXANDER | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Donovan Alexander ("Donovan") and Jarvis Alexander ("Jarvis") are each

charged with one count of sex trafficking children by force, fraud, or coercion, in violation of 18

U.S.C. §§ 1591(a)(1), (a)(2), (b)(1), (b)(2), and (c), and one count of conspiracy to commit sex

trafficking of children by force, fraud, or coercion in violation of 18 U.S.C. § 1594(c). In

addition, Donovan is charged with one count of transporting a minor with intent to engage in

criminal sexual activity, in violation of 18 U.S.C. § 2423(a). Defendants were charged after

police officers initiated a traffic stop of a vehicle driven by Jarvis and with Donovan and a minor

girl as passengers. After Jarvis and Donovan failed to comply with the officers' instructions, they

were arrested. The minor passenger subsequently revealed to police that she was a victim of

trafficking. Now, Defendants move to suppress all evidence derived directly or indirectly from

their arrest, as they contend that the officers had no justification for the traffic stop precipitating

their arrest. (Dkt. No. 47.) For the reasons that follow, Defendants' motion is denied.

## BACKGROUND

The Court held an evidentiary hearing regarding Defendants' motion  on May 12, 2022.

At the evidentiary hearing, the Government called as witnesses two Chicago Police Department

officers involved in Defendants' arrest, John Salinas and Nathan Smith. The Government also

introduced into evidence video from Salinas's and Smith's body-worn cameras, a map of the

area where the relevant events occurred, and a photograph of the gas station from which

Defendants had departed shortly before they were stopped. Neither Defendant testified or called

witnesses. The following summarizes the substance of the evidence adduced at the hearing.

On February 29, 2020, Chicago Police Department officers John Salinas and Nathan

Smith were patrolling Chicago's 6th Police District in an unmarked police vehicle. At around

4:30 p.m., the officers were inside their vehicle, which was parked on Halsted Street facing

southward, slightly north of the intersection of Halsted and 83rd Street. Smith was in the

passenger seat of the police vehicle and Salinas was in the driver's seat where he had a clear

view across Halsted of a Falcon Fuel gas station. At the Falcon Fuel station, Salinas observed a

man entering a white Nissan sedan after fueling that vehicle. The white Nissan then exited the

Falcon Fuel station and turned right to go northbound on Halsted. Salinas testified that he had a

clear view inside the white Nissan while it exited the station and was able to observe that the

driver was not wearing his seatbelt.

Upon observing the traffic violation, Salinas made a U-turn and began driving

northbound on Halsted to stop the white Nissan. Salinas followed the white Nissan for about two

minutes before pulling the vehicle over close to the intersection of 79th Street and Union

Avenue. Both Salinas and Smith testified that while they were following the white Nissan, they

were unable to see what the driver was doing. After the white Nissan stopped, Salinas

approached the driver's side of the vehicle where he observed Jarvis in the driver's seat with his

seatbelt fastened, Donovan in the front passenger seat, and a girl seated in the rear. Meanwhile,

Smith approached the passenger's side of the vehicle.

At the outset of the encounter, Salinas testified that Jarvis appeared nervous and was

shaking uncontrollably. Further, Salinas stated that he observed weed crumbs inside the white

2

Nissan and smelled the odor of marijuana. Similarly, Smith testified that he could smell the odor

of marijuana coming from the vehicle. Salinas directed Jarvis to produce his driver's license and

proof of insurance, and Jarvis complied. At the same time, Smith spoke with Donovan and

obtained identifying information from him. Salinas and Smith then returned to their police

vehicle to run Jarvis's license. About a minute later, Salinas and Smith returned to the white

Nissan and Salinas directed Jarvis to step out of the vehicle. Salinas testified that he asked Jarvis

to leave the car because he intended to conduct a narcotics investigation due to both the odor of

marijuana[1] and Jarvis's nervous demeanor. Instead of complying with Salinas's order, Jarvis

repeatedly asked why he was being asked to step out of his car. Eventually, Salinas responded

"because I can smell the weed." However, Jarvis continued to resist Salinas's order.

Because Jarvis refused to exit the vehicle as instructed, Smith called a supervisor, which

was standard procedure in such circumstances. About ten minutes after the encounter began, a

supervisory sergeant arrived and began speaking with Jarvis. The sergeant gave Jarvis one final

opportunity to exit the white Nissan voluntarily, but Jarvis remained noncompliant. For that

reason, Salinas broke the driver's side window, took Jarvis from the car, and handcuffed him.

Over by the passenger's side, Smith opened the front door to remove Donovan from the car

before turning to remove the backseat passenger. Both Jarvis and Donovan were then arrested. It

was only after Jarvis and Donovan were taken to the police station that a traffic citation was

---

[1] Although recreational use of modest amounts of marijuana was legal in Illinois at the time of the stop, it was nonetheless illegal for a person to consume marijuana while driving or to have marijuana inside a vehicle unless properly stored. *See* 625 ILCS 5/11-502.15 (making it illegal to possess cannabis in a vehicle unless the substance is in a "secured, sealed or resealable, odor-proof, child-resistant cannabis container that is inaccessible").

issued to Jarvis for failing to wear his seatbelt. At no point in the encounter did either Salinas or

Smith inform Jarvis of the reason for the traffic stop.[2]

## DISCUSSION

Both Jarvis and Donovan ask this Court to suppress all evidence obtained as a result of

their seizure on February 29, 2020. Defendants' sole basis for suppression is that Salinas and

Smith's stop of the white Nissan was not supported by reasonable suspicion and therefore

violated the Fourth Amendment.

Under the Fourth Amendment, "[t]emporary detention of individuals during the stop of

an automobile by the police, even if only for a brief period and for a limited purpose, constitutes

a 'seizure' of 'persons.'" *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Because traffic

stops are seizures, "they must be reasonable under the circumstances." *United States v. Cole*, 21

F.4th 421, 428 (7th Cir. 2021). And because traffic stops are deemed analogous to *Terry* stops,

*see Terry v. Ohio*, 392 U.S. 1 (1968), "they require only reasonable suspicion of a traffic

violation." *Cole*, 21 F.4th at 428. "Reasonable suspicion must account for the totality of the

circumstances and requires more than a hunch but less than probable cause and considerably less

than preponderance of the evidence." *United States v. Smith*, 32 F.4th 638, 641 (7th Cir. 2022).

The standard is an objective one and is "based upon the facts available to the officers at the

moment of the seizure." *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020) (internal

quotation marks omitted). "When officers reasonably believe they have witnessed a traffic

violation, that provides reasonable suspicion justifying a traffic stop, even if the violation is quite

---

[2] Police body-worn cameras automatically store video from two minutes before the camera is activated. As a result, there is video of Officers Salinas and Smith following the white Nissan as it exited the Falcon Fuel station. By contrast, audio is recorded only from the time of activation. Here, the officers activated their respective body-worn cameras only after the white Nissan was curbed. Consequently, there is no audio recording of what the officers said while they were following the white Nissan.

minor." *Smith*, 32 F.4th at 641. It is the Government's burden to prove by a preponderance of the evidence that reasonable suspicion supported a traffic stop. *Jackson*, 962 F.3d at 357.

There is no dispute that Illinois requires an automobile's driver and any passengers to wear their seatbelts. 625 ILCS 5/12-603.1(a). Accordingly, a police officer's belief that a car's occupant is not wearing a seatbelt provides reasonable suspicion to initiate a traffic stop. *E.g.*, *United States v. Davis*, No. 11 CR 62, 2013 WL 1628166, at *5 (N.D. Ill. Apr. 15, 2013) (finding that the police officers' observations of an automobile's occupants not wearing their seatbelts gave the officers reasonable suspicion that the occupants were engaged in unlawful conduct). Despite the fact that, here, both Salinas and Smith's body cameras captured video beginning around the time the white Nissan left the Falcon Fuel station, neither camera provided a visual of the white Nissan prior to that vehicle being pulled over. Moreover, since the audio did not begin recording until the officers activated their cameras, the Court has no audio evidence of any communications between Salinas and Smith from before they exited their police vehicle. The only evidence before the Court as to the existence of reasonable suspicion is Salinas's testimony that he saw Jarvis not wearing a seatbelt as he drove the white Nissan out of the Falcon Fuel station and Smith's testimony that Salinas told him that they were stopping the vehicle for that reason. Consequently, resolution of the motion to suppress turns on whether the Court finds Salinas's and Smith's testimony credible.

Defendants point to several factors that they believe reflect negatively on the officers' testimony. Most significantly, Defendants make much of the fact that, by the time Salinas approached the driver's side door of the white Nissan, Jarvis can plainly be seen on video with his seatbelt fastened. But of course, it is entirely possible that Jarvis may have quickly fastened his seatbelt at some point before his initial interaction with Salinas. Indeed, both Salinas and

Smith testified that they did not have a clear view of Jarvis during the approximately two-minute period in which they were following the vehicle, such that they would not have seen if Jarvis had fastened his seatbelt during that time. More importantly, even if Salinas's observation of Jarvis not wearing his seatbelt was mistaken and Jarvis was, in fact, wearing his seatbelt the entire time, such a mistake does not "delegitimize the stop." *United States v. Avila*, No. 20-cr-605, 2022 WL 2818705, at *14 (N.D. Ill. July 19, 2012). "The Fourth Amendment requires reasonable suspicion, not certitude and perfection. It is enough if the officer reasonably believed that he witnessed a driving violation." *Id.*; *see also United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019) ("Whether the driver actually committed a traffic infraction is irrelevant for Fourth Amendment purposes so long as there was an objective basis for a reasonable belief he did.").

To argue that Salinas lacked an honest, even if mistaken, belief that Jarvis was not wearing his seatbelt, Defendants emphasize that Salinas never mentioned a seatbelt violation at any point during the stop. While Salinas testified at several points that he thought he had informed Jarvis why he had been stopped, it is clear from the audio that Salinas never did. However, the fact that Salinas failed to inform Jarvis of the basis for the stop is not particularly probative to the reasonable suspicion inquiry. *Cf. Devenpeck v. Alford*, 543 U.S. 146, 155 (2004) ("While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required."). Further, the evidence suggests that Salinas never mentioned a seatbelt violation because he quickly had reason to suspect that additional criminal activity was afoot: by the time that Salinas approached the white Nissan, both he and Smith testified that they could smell marijuana. Then, when Salinas ordered Jarvis to exit the vehicle, he refused to comply. Those events expanded the scope of the stop's mission beyond simply addressing a traffic infraction and explains why Salinas

6

never got around to informing Jarvis of the original reason for the stop. *See United States v. Davis*, No. 19-cr-40006-JPG, 2019 WL 5555567, at *7 (S.D. Ill. Oct. 28, 2019) (observing that the officers' failure to write tickets for the violations supporting their reasonable suspicion was not relevant because "supervening events deterred them from writing tickets and diverted their attention to more serious concerns—resisting and narcotics"); *cf. United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007) ("[I]nformation lawfully obtained during [the time reasonably required to issue a traffic ticket] may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation.").

Next, Defendants claim that if Salinas truly believed he saw Jarvis without his seatbelt when he drove out of the Falcon Fuel station, Salinas and Smith would have immediately pulled the white Nissan over. Instead, the officers followed the car for about two minutes and several blocks before finally curbing it. Salinas attributed the delay to the officers' search for a location where they could safely conduct the traffic stop. In any case, a brief interval between an officer's observation of a traffic violation and the initiation of the stop does not, by itself, call reasonable suspicion into question. *See United States v. Dowthard*, 500 F.3d 567, 570 (7th Cir. 2007) ("Driving an extra three blocks after observing a violation is not so extraordinary to suggest that the reason for the traffic stop was contrived.").

Finally, Defendants question Salinas's credibility by noting the discrepancy between his testimony that Jarvis's hands were shaking uncontrollably when interacting with Salinas and the video evidence. The Court agrees that Salinas's body-worn camera provides a view of Jarvis's hands (albeit obstructed to a small degree by the driver's side window, which was only partially rolled down) and the hands are not discernably shaking in the video. At the same time, the Court does not discount the possibility that shaking visible in person was not easily perceivable on

7

video, which is what Salinas suggested when cross-examined on the point. Regardless of whether he was literally shaking, Jarvis's generally nervous demeanor is evident from the video.

Defendants have given this Court no reason to doubt the veracity of either Salinas's or Smith's testimony. At bottom, the question before this Court is whether Salinas honestly and reasonably believed that Jarvis was not wearing a seatbelt as he drove from the Falcon Fuel station on February 29, 2020. The Court finds that he did. To begin, the evidence shows that the officers were well-positioned to observe the infraction. The officers were in a parked vehicle and could fully observe their surroundings with minimal distraction. Their vehicle was directly across the street from the Falcon Fuel station and, aside from some passing cars, Salinas's view from the driver's seat was unobstructed. And the relevant events occurred during the daytime, with the video evidence showing blue skies and ample sunlight.

Further, the evidence demonstrates that the officers had the opportunity to observe the infraction. Specifically, the white Nissan exited the Falcon Fuel station by turning right onto Halsted such that, prior to the turn, the vehicle's front windshield was directly facing the driver's side window of the officers' parked police vehicle. In other words, Salinas was positioned such that he could look out of the driver's side window of his car and see inside the front interior portion of the white Nissan. And the white Nissan's front windshield was not tinted so as to diminish the interior's visibility.

To conclude that reasonable suspicion was lacking, the Court would have to find that Salinas and Smith gave false testimony regarding the sequence of events leading up to the stop and, in particular, whether Salinas reasonably believed that he had observed Jarvis inside the white Nissan without a seatbelt as he drove out of the Falcon Fuel station. The Court does not believe that they did. As discussed above, Defendants have failed to discredit either Salinas or

Smith, and the Court finds from its own observations of their testimony that both officers were generally credible witnesses. Therefore, the Court concludes that the Government has established that Salinas and Smith had reasonable suspicion to stop the white Nissan.

## CONCLUSION

For the foregoing reasons, Defendants' motion to suppress (Dkt. No. 47) is denied.

ENTERED:

Dated:  February 24, 2023

Andrea R. Wood
United States District Judge